IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARCUS C. ROBINSON,

                         Petitioner,                        OPINION AND ORDER

       v.                                                17-cv-204-wmc

DYLON RADTKE, Warden[1],
Green Bay Correctional Institution,

                         Respondent.

---

Marcus Robinson was convicted on one count of second-degree sexual assault of an unconscious victim in Dane County Court on September 12, 2013, and sentenced to 30 years of incarceration followed by extended supervision. He is presently an inmate at Green Bay Correctional Institution. In this habeas corpus proceeding brought under 28 U.S.C. § 2254, Robinson alleges that his trial lawyer was ineffective in choosing not to impeach the victim's credibility with respect to written statements she made on a questionnaire in connection with her sexual assault examination. As explained below, petitioner has failed to meet the high burden of showing that Wisconsin courts adjudicated this same claim in a manner that was contrary to or involved an unreasonable application of clearly established federal law. As such, this federal court must deny his petition.

---

[1] Dylon Radtke, currently the warden at Green Bay Correctional Institution, is substituted for his predecessor, William Pollard. *See* Rule 2(a) of the Rules Governing Section 2254 Cases.

FACTS[2]

## A.   Trial Proceedings

The facts leading up to Robinson's alleged, second-degree sexual assault of the unconscious victim, C.C., were not disputed at trial.   Robinson had been staying at a friend's apartment. C.C.'s boyfriend at the time, J.K., lived in the same apartment complex as Robinson's friend.   On the evening of the alleged assault, C.C., Robinson, and others were drinking at J.K.'s apartment.   The group left to go to a bar, but C.C. felt sick from the alcohol she had consumed and returned to J.K.'s apartment to lie down in his room. While J.K., Robinson, and others in the group went on to a party at a different apartment in the complex, Robinson left that party after about 20-30 minutes, and he went back to J.K.'s apartment as well.

At trial, C.C. testified that she had fallen asleep on a mat in J.K.'s room, but later awoke to Robinson sexually assaulting her.   C.C. further testified that, after realizing it was not J.K., she rolled away from Robinson and ran into the bathroom, where she waited until J.K. came home.   Both C.C. and J.K. testified that, when J.K. arrived at the apartment, C.C. came out of the bathroom crying and told J.K. that Robinson had raped her.   However, when J.K. confronted Robinson, he denied the accusation and said C.C. was lying.   J.K. promptly took C.C. to the hospital.

Jill Fisher, a nurse, testified that she performed a SANE exam of C.C. around 3 a.m. on the date of the incident.   Fisher also testified about C.C.'s description of the assault

---

[2] The following facts are drawn from the record of the state court proceedings, attached to the state's response.   (Dkt. # 17.)

during her exam, which generally matched C.C.'s testimony at trial.   During her examination, Fisher also noted that C.C. had a "friction abrasion" in the vaginal area, which Fisher testified was consistent with C.C.'s description of non-consensual intercourse from the rear.   The prosecutor moved Fisher's SANE report into the record, and the court received it with no objection, although it was not ultimately sent into the jury room during deliberations.[3]

On cross-examination, defense counsel asked Fisher about a section of the report revealing the victim's answers to a series of specific questions about what happened during the assault.   The exchange between counsel and Fisher at trial went as follows:

Q:   And the possible answers are – what are the possible answers on those?

A:   Yes, no, attempted and unsure.

Q:   And [C.C.] answered those questions, correct?

A:   Yes.

Q:   Did she answer any of those questions attempted?

A:   No.

Q:   Did she answer any of them unsure?

A:   No.

Q:   Did she answer any of those questions either yes or no?

A:   Yes.

---

[3] A copy of the report is in the record at dkt. # 29-1.   The pertinent section has 22 questions that ask specific questions about what occurred during the assault.

Q:  For example, did she answer, how did she answer "did assailant's penis enter patient's vagina?"

A:  Yes.

Q:  And how did she [answer] "did assailant's fingers contact patient's external genitals?"

A:  No.

(Trial Tr., Day 1 (dkt. # 17-11) 208:13-209:7.)

During his defense, Robinson chose to take the stand, and he did not dispute having had sexual intercourse with C.C.; rather, he denied that she had been unconscious. According to Robinson, C.C. had been fully conscious, and their intercourse had been consensual.   After they finished having sex, however, Robinson testified that C.C. asked if it "was the best I had," to which he responded that it was "all right, but I've had better." According to Robinson, his response made C.C. angry.   (Trial Tr., Day 2 (dkt. # 17-12) 44:24-25-45:1-14.)   At that point, he testified that C.C. scooted away, grabbed her shorts and underwear, and went into the bathroom.   Robinson testified he then went outside to smoke a cigarette, and upon returing to the apartment, he was confronted by J.K.   At that point, Robinson testified that he denied having had sex with C.C., but did so because J.K. was visibly enraged and he knew J.K. owned a gun.

During closing argument, defense counsel emphasized the SANE evaluation and the answers that C.C. had provided:

[C.C.] also did have a SANE exam and the nurse did evaluate her.   As the nurse told you, she was not there.   She could not tell you whether [C.C.] was unconscious or not.   During that evaluation, and I'm going to open up

4

a board over here.[4]  It's not going to be long, I'm not going to do a whole lot.  The nurse testified that during that evaluation there's a series of questions that say what happened to you very specifically, what parts were touched, where penis was inserted specifically, where people were kissed, and there were answers to those questions that she could give.  The answers were yes, no, unsure and attempted.  [C.C.] answered a whole series of questions yes and no based on what happened to her.  She was not unsure of where she was touched at all.  She was sure.  The nurse asked her and gave us the answer.  Part of the evaluation they did was based on the responses.  If she had not known what happened to her, she had every opportunity to tell the SANE examiner at that time.

(*Id*. at 119:14-120:14.)

The jury returned a guilty verdict.

## B.  Post-Trial Proceedings

After sentencing, Robinson filed postconviction motions for a new trial, arguing that his trial counsel rendered ineffective assistance and that the real controversy was not fully tried.   Robinson argued that his trial counsel had performed deficiently by failing to cross-examine either C.C. or Fisher about the statements on the SANE questionnaire -- in particular, about C.C.'s denial that she had lost memory or consciousness during the assault.   Robinson further argued that his counsel should have asked Fisher about all 22 of C.C.'s responses to the questionnaire, pointing out that she never answered "unsure" to a single question about the assault, rather than asking about only two responses.

The circuit court held an evidentiary hearing at which Robinson's trial counsel testified.   Under questioning by Robinson's post-conviction counsel, trial counsel testified

---

[4] This reference to a "board" suggests that counsel may have been referring to a demonstrative exhibit displaying the SANE questionnaire to the jury, but this is not entirely clear from the record.

that one of the ways she hoped to impeach C.C.'s credibility was to present the answers
she gave to Fisher, the SANE examiner.   (Tr. of Post-Conviction Mot. Hrg. (dkt. # 17-14)
23.)   When asked if she had considered going through the individual responses to all 22
of the sexual acts questions with either C.C. or Fisher, rather than focusing on just two
responses, trial counsel answered:

> I certainly would not have asked about all of them.   I asked about the ones
> that I thought were germane to this case and got the point across, I don't
> think that I would have gone through a laundry list.

(*Id*. at 25:6-10.)   On cross-examination, trial counsel further explained that her goal on
cross-examination was to "get some good answers in a short period of time," and she felt
in particular that had been accomplished with Fisher.   (*Id*. at 36:8-22.)

When further asked if she had specifically considered eliciting testimony about
C.C.'s answer of "no" to the question regarding any lapse of consciousness, trial counsel
answered:

> I was concerned if I went too far down that road I would get a reiteration of
> the fact that she had been passed out and that would give them an
> opportunity to simply restate that through another witness.   So I did make
> a decision not to specifically address that as I believe that they would have
> used it as an opportunity to state that she was passed out, but she never lost
> consciousness in the sense that she blacked, you know, that she had a head
> injury or something like that and that after she was aware of what was going
> on she had now lost consciousness.

(*Id*. at 28:14-25.) On cross-examination, trial counsel further explained:

> The SANE examiner had I believe testified that, you know, she couldn't say
> what had occurred that evening.   That she only knew the things that she was
> was told.   And I did not want to give her a chance to again reiterate that
> [C.C.] told her that she was unconscious.   The SANE examiner did not
> testify to that.

(*Id.* at 37:18-24.)

Applying the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), for evaluating claims of ineffective assistance of counsel, the trial court found on the record that trial counsel had *not* performed deficiently with respect to her questioning about C.C.'s answers to the SANE questionnaire.   In particular, the court found that:   (1) counsel elicited testimony from Fisher to the effect that there were lots of questions on the questionnaire *and* C.C. "was not unsure on any of them"; (2) it was unnecessary for counsel to go through the entire list of questions with a witness to make that point; and (3) counsel had again called C.C.'s answers to the jury's attention during closing argument by referring to the questionnaire, which had been admitted into evidence.   (*Id.* at 81:182:12.)

As for counsel's failure to ask Fisher specifically about C.C.'s answer on the form denying that she lost consciousness, the court found that trial counsel reasonably interpreted the question as posed on the form to be asking whether the victim had lost consciousness *after* she became aware that she was being sexually assaulted, making her answer of "no" consistent with her description of the assault.   (*Id.* at 83:1-8.)   The trial court also observed "[t]rying to use that as a wedge to undermine credibility could only work with a jury that's not willing to really bring their common sense to the process," and further could have hurt Robinson by undermining his counsel's credibility.   (*Id.* at 83:8-15.)   Finally, the trial court found that, even if some of counsel's choices were objectively unreasonable, Robinson had not been prejudiced because "the totality of all of the evidence was clearly in support of the verdict."   (*Id.* at 86:22-24.)

The Wisconsin Court of Appeals upheld Robinson's conviction on appeal as well. *State v. Robinson*, 371 Wis. 2d 565, 884 N.W. 2d 535 (Table), 2016 WI App 67, 2016 WL 3919252 (unpublished disposition).   In particular, the court of appeals found that trial counsel's decision to be "short and to the point" with the SANE nurse was a reasonable strategic decision, avoiding questions that would have given her the opportunity to reiterate C.C.'s assertion that she was "passed out" when the assault began, and thus, was certainly not grounds to find a deficient performance.   *Id*. at ¶ 14.   The Wisconsin Supreme Court subsequently denied petitioner's petition for review.

OPINION

In his habeas petition, Robinson reasserts his claim that his trial counsel was ineffective in failing to impeach C.C.'s credibility more fully with her statements on the SANE questionnaire.   As an initial matter, respondent concedes that petitioner has fully exhausted his state court remedies on this claim, making it appropriate for this court to consider the merits of the petition.   However, to make out a claim of ineffective assistance of counsel after *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must show that: (1) his counsel's performance fell below an objective standard of reasonableness; *and* (2) he was prejudiced by his counsel's failures.   *Id.* at 687-88.   To establish deficient performance in particular, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   *Id*. at 687.

8

The performance inquiry is "highly deferential," considering whether counsel's actions were "reasonable considering all the circumstances." *Id*. at 688-89. When assessing an attorney's performance,

> every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, supra, 350 U.S., at 101, 76 S.Ct., at 164.

*Id*. at 689–90.

Moreover, federal courts must apply an even *more* deferential standard of review to a claim of ineffective assistance of counsel brought in a habeas petition challenge under § 2254(d). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (§ 2254(d) requires courts to defer to reasonable state court applications of federal law) (internal citations and quotations omitted). More specifically, under 28 U.S.C. § 2254(d), federal courts are not authorized to grant relief on claims that were adjudicated on the merits in state court unless the prisoner shows either that: (1) the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). In addition, federal courts presume that state court determinations of fact are correct. 28 U.S.C. § 2254(e)(1).

9

Thus, when a federal court applies section 2254(d) to a state court's adjudication of a *Strickland* claim, then,

> [t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles,* 556 U.S. at 123 (internal quotations and citations omitted). This so-called "double deference" means that "only a clear error in applying *Strickland* would support a writ of habeas corpus." *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997).

In applying this exceptionally deferential standard, federal courts are to look to the "last reasoned state–court decision" to decide the merits of the case, which in this case was the Wisconsin Court of Appeals. *Johnson v. Williams*, 568 U.S. 289 (2013). And so long as the Wisconsin Court of Appeals "t[ook] the [constitutional standard] seriously and produce[d] an answer within the range of defensible positions," *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000), this court must deny the writ. In this case, petitioner does not come close to meeting this daunting standard.

As an initial matter, the Wisconsin Court of Appeals adopted the correct legal test, noting that to succeed on his ineffective assistance claim, petitioner had to show both that counsel's performance was deficient and that the deficient performance prejudiced him. *Robinson*, at ¶ 5 (citing *Strickland*, 466 U.S. at 687, *State v. Swinson*, 2003 WI App 45, ¶ 58, 261 Wis. 2d 633, 662, 660 N.W.2d 12, 25). Specifically, as for the performance prong, the Wisconsin Court of Appeals noted that petitioner had to show that "the acts or

omissions of counsel were unreasonably outside professional norms."   *Id*. (citing *Swinson*, 2003 WI App 45, ¶ 58).

Having correctly identified the controlling legal standard, the *only* question is whether the Wisconsin Court of Appeals made a "clear error" in determining that defense counsel's performance in petitioner's case fell within the range of what could be considered sound legal strategy.   This court not only finds no such error, but readily agrees with the Wisconsin Court of Appeals' conclusion.

As that court recognized, once counsel established that C.C. answered with certainty numerous questions about the sexual assault -- despite having been "passed out" from heavy alcohol consumption -- she acted well within the range of competent legal strategy to focus on 2 questions to which C.C. answered with such certainty.   Perhaps taking Fisher through the entire "laundry list" of 22 questions on the SANE questionnaire would have been within range of competent representation, though *at least* as reasonable was the "short and to the point" approach adopted by petitioner's trial counsel.   Regardless, because the SANE questionnaire was admitted into the record, counsel was able to emphasize C.C.'s arguably questionable certainty as to all the questions during her closing argument, without risking unhelpful elaboration by the witness or boring the jury during the presentation of the evidence.   In short, giving both counsel and the Wisconsin Court of Appeals the deference the law requires, the court of appeals properly applied the *Strickland* standard in finding that petitioner's counsel acted reasonably in limiting the number of questions posed to C.C. and Fisher about the SANE questionnaire.

If anything, this is even more true with respect to petitioner's criticism of counsel's decision specifically not to ask Fisher about C.C.'s answer as to whether she had a "lapse of consciousness."   Petitioner's trial counsel testified that she deliberately avoided asking Fisher about that question because it would likely elicit testimony from Fisher on redirect (or through another witness) explaining that C.C. reported having been "passed out" or unconscious when the assault first began.   As the Wisconsin Court of Appeals found, given petitioner's defense was that the sex was *consensual*, counsel's decision to avoid questions that would have emphasized C.C.'s unconsciousness was a patently reasonable trial strategy, especially when she would likely emphasize *not* passing out or losing consciousness *once realizing* that she was being raped.   Considering the totality of the circumstances from counsel's perspective at the time, and her patently reasonable explanation for her response to the SANE questionnaire, therefore, petitioner has failed to overcome the presumption that trial counsel was exercising sound trial strategy, much less that the Wisconsin Court of Appeals erred in applying *Strickland* reasonably to reach the same conclusion.

As the Supreme Court observed in *Strickland*, 466 U.S. at 689, "[t]here are countless ways to provide effective assistance in any given case."   The fact that the jury ultimately found C.C.'s version of events more credible than petitioner's does not mean that his trial was unfair or his counsel ineffective.   To the contrary, the record shows that his counsel was a vigorous advocate who diligently and effectively pursued petitioner's defense.[5]

---

[5] Since petitioner's *Strickland* claim fails on the performance prong, the court need not address respondent's alternate argument that petitioner cannot meet the prejudice prong.  *See Strickland*, 466 U.S. at 697 (court need not address both components of inquiry if petitioner makes an insufficient showing on one).

ORDER

IT IS ORDERED that Marcus Robinson's petition for a writ of habeas corpus is DENIED.  Because reasonable jurists would not disagree with the conclusion that the Wisconsin Court of Appeals reasonably adjudicated petitioner's claim of ineffective assistance of counsel, a certificate of appealability will not issue.

Entered this 23rd day of February, 2021.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

13